Gerald THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 13763.

District of Columbia Court of Appeals.

Argued May 3, 1979.

Decided July 14, 1980.

Michael B. Waitzkin, Washington, D. C., with whom Silas J. Wasserstrom, Washington, D. C., was on the briefs, for appellant.

Ann P. Gailis, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. at the time the brief was filed, Washington, D. C., John A. Terry, Oscar Altshuler, Robert St. John Roper and John W. Polk, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before GALLAGHER, NEBEKER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This appeal raises questions concerning the procedure to be followed once a person

charged with a crime is committed to a mental hospital due to incompetency to stand trial and is found unlikely to regain his competency in the reasonably foreseeable future. Appellant was committed upon being found incompetent to stand trial for threatening another person, D.C.Code 1973, § 22–2307, and after about a year of treatment and observation was found unlikely to become competent in the foreseeable future by the trial court. The court then directed the government to commence civil commitment proceedings within 28 days, which period was later extended 14 additional days. During this extension period, appellant moved for release pending the disposition of the civil commitment procedures. This motion was denied by the trial court, and appellant remained confined in the hospital. He was later ordered committed under the civil commitment statute. He now seeks review of the trial court's denial of his motion for release. Appellant contends his continued confinement after he was found unlikely to become competent in the foreseeable future, and prior to completion of civil commitment procedures, violated equal protection. We disagree and affirm.[1]

The record shows appellant was arrested on June 21, 1977, and charged with threatening to injure another person. After his presentment he was ordered held for psychiatric evaluation in District of Columbia Hospital pursuant to D.C.Code 1973, § 24–301(a) to determine his competency to stand trial on these charges. On August 23, 1977, based on the hospital's report, the trial court found appellant incompetent to stand trial and committed him to St. Elizabeths Hospital, also pursuant to § 24–301(a). During the next year, he was treated and observed at the hospital. Court hearings were held pursuant to *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), to determine during this period whether it was likely appellant would attain competency to stand trial within the foreseeable future.[2] Because of hospital doubts over appellant's condition, however, no findings on this question were made by the trial court on either December 14, 1977, or April 27, 1978, when hearings were held, although on both occasions the trial court affirmed the original findings of incompetency. Finally, on June 28, 1978, the court found, based on psychiatric testimony and hospital reports, that appellant was not likely to regain his competency to stand trial within the reasonably foreseeable future.[3]

The court determined that approximately 30 days would be an appropriate amount of time for the government to commence civil commitment procedures against appellant, as required by *Jackson v. Indiana, supra,* and it set a status hearing for July 26, 1978. This arrangement was accepted by both the government and appellant. On July 26, the status hearing was rescheduled for August 9, 1978—*i. e.,* 42 days from the date of the *Jackson* findings—because the government failed to initiate civil commitment procedures in the originally specified time. This failure was apparently due to misdelivery of a report by a hospital messenger to the United States Attorney's office. During this extension appellant moved for release from the hospital, contending that any confinement after *Jackson* findings were entered, and pending disposition of civil commitment procedures, violated equal protection[4] un-

---

1. Although appellant was civilly committed while this appeal was pending and consequently could not be released even if we reversed the trial court, we consider the case is not moot and should be decided on the merits. *See Sibron v. New York,* 392 U.S. 40, 51, 88 S.Ct. 1889, 1896, 20 L.Ed.2d 917 (1968).

2. On September 28, 1977, appellant was indicted by the grand jury for assault with intent to kill, D.C.Code 1973, § 22–501, and threats to do bodily harm, *id.,* § 22–507.

3. For simplicity we will refer to these findings as the *Jackson* findings.

4. Though the Fourteenth Amendment is not applicable to the District of Columbia, concepts of equal protection are inherent in the due process of law guaranteed to District citizens under the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Washington v. United States,* 130 U.S. App.D.C. 374, 401 F.2d 915 (1968).

der *Jackson v. Indiana, supra.* Two days later, on August 9, the government initiated civil commitment proceedings pursuant to D.C.Code 1973, § 21–541. A court hearing was held on August 16 on appellant's motion for release, at which time the court noted:

> [I]n this case the defendant was charged criminally with an act that was really very frightening, a very frightening thing, when he held that child and then dropped that child from a window; obviously something was wrong with him. I don't think normal people would drop a child out a window and then go around and carry on the way he did.
>
> \* \* \* \* \* \*
>
> This defendant has been found by the doctor up there, the psychiatrist, to be of unsound mind, and he also found as follows: "That the defendant is likely to injure himself or others if allowed to remain at liberty," and then further stated, "If he were not in a structured environment receiving medication, his ability to control his actions would be impaired. His ability to distinguish reality from fantasy is already severely impaired, e. g., cannot distinguish 'charge' from 'deed' itself. Therefore, dangerous actions, not unlike his previous behavior, is likely to occur." *I think this opinion by the psychiatrist is sufficient to stand in place of these other findings, and I think the Court would be remiss if it were to turn this person out on the street at this time. Moreover, he is at this time in a place*

*where he is receiving medication and is under control.* [8/16/78 Tr. 2–4 (emphasis added).]

The court accordingly denied appellant's motion for release, and appellant now seeks an order requiring his release.[5]

The statutory provisions relevant here provide for three types of involuntary commitment: non-emergency civil commitment of individuals not charged with crime, D.C. Code 1973, § 21–541; emergency civil commitment of individuals not charged with crime, *id.,* § 21–521; and pretrial commitment of individuals charged with crime due to a finding of incompetency to stand trial, *id.,* § 24–301(a). Procedures for non-emergency civil commitment are commenced under § 21–541(a) by filing a petition with the Commission on Mental Health.[6] The petition may be filed by, *inter alia,* designated family members, physicians, and certain public authorities. *Id.* It must be accompanied by the certificate of a physician who has examined the person and asserts he is mentally ill and, because of that mental illness, is likely to injure himself or others. *Id.* Once the petition has been filed, the Commission conducts a hearing at which the person sought to be hospitalized is present, represented by counsel, and permitted to present and cross-examine witnesses. *Id.,* §§ 21–542, –543. If the Commission finds the person is not mentally ill and dangerous, the commitment process is terminated. If the Commission finds the statutory standards are met, however, it

---

5. As a result of the civil commitment proceedings, appellant was committed to St. Elizabeths on September 29, 1978.

6. Section 21–541 provides:

(a) Proceedings for the judicial hospitalization of a person in the District of Columbia may be commenced by the filing of a petition with the Commission on Mental Health by his spouse, parent, or legal guardian, by a physician, by a duly accredited officer or agent of the Department of Public Health, or by an officer authorized to make arrests in the District of Columbia. The petition shall be accompanied by:

(1) a certificate of a physician stating that he has examined the person and is of the opinion that the person is mentally ill, and

because of the illness is likely to injure himself or other persons if allowed to remain at liberty; or

(2) a sworn written statement by the petitioner that:

(A) the petitioner has good reason to believe that the person is mentally ill, and, because of the illness, is likely to injure himself or other persons if allowed to remain at liberty; and

(B) the person has refused to submit to examination by a physician.

(b) Within three days after the Commission receives a petition filed under subsection (a) of this section, the Commission shall send a copy of the petition by registered mail to the person with respect to whom it was filed.

reports its finding to the court, which sets the matter for a hearing. *Id.*, §§ 21–544, –545. The person sought to be hospitalized may at this juncture demand a jury trial; if no such demand is made, the case is tried to the court without a jury. *Id.*, § 21–545. In either event, unless the Commission's findings are uncontested, the petitioner must prove by clear and convincing evidence that the respondent is mentally ill and because of that illness likely to be dangerous to himself or others. *In re Nelson*, D.C.App., 408 A.2d 1233 (1979). If, on the other hand, the Commission's report and recommendation are uncontested by the respondent, the court may enter a final order of commitment based on the Commission's report.

Under the emergency civil commitment procedures of D.C.Code 1973, §§ 21–521, *et seq.*, a mentally ill person who is "likely to injure himself or others if he is not *immediately* detained" (emphasis supplied) may be taken into custody for emergency observation and diagnosis. *Id.*, § 21–527.[7] The period of observation is limited to forty-eight hours unless the hospital files papers seeking an order from the court to continue the observation for seven additional days. *Id.*, §§ 21–523, –524. If such an order is entered, the person is then entitled to a probable cause hearing before the court. *Id.*, § 21–525. At this hearing the hospital or the petitioner need not produce testimony, but may rely on the papers which were before the judge who authorized the seven-day commitment under § 21–524, unless the patient offers evidence which "sufficiently rebuts the documentary evidence." *In re Barnard*, 147 U.S.App.D.C. 302, 306, 455 F.2d 1370, 1374 (1971). At the end of the seven-day period, the hospital must either release the patient or commence civil commitment procedures by filing a petition with the Mental Health Commission for his

judicial hospitalization under § 21–541. Significantly, once such a petition has been filed, the patient may be held until the completion of the procedures. D.C.Code 1973, § 21–528.

The provision under which appellant was committed applies only to persons charged with crime. It provides that where the court determines the accused "is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense" the court may order him confined to a mental hospital "for such reasonable period as the court may determine for examination and observation and for care and treatment if such is necessary . . . ." *Id.*, § 24–301(a). If the hospital authorities report the accused is of unsound mind or mentally incompetent, the court may commit the accused to a mental hospital. If the accused or the government objects to his commitment, however, the court must make a judicial determination of competency after a nonjury hearing. If the accused is then found incompetent by the court, it "shall order the accused confined to a hospital for the mentally ill." *Id.* This provision, enacted prior to *Jackson v. Indiana, supra*, places no time limit on this confinement. It would appear, however, that the trial judges in this jurisdiction have been holding so-called "*Jackson* hearings" to determine whether the accused is still incompetent and, if so, whether he is likely to regain competency in the foreseeable future. If he is found unlikely to regain his competence in the foreseeable future, under *Jackson* the government must either pursue civil commitment procedures or the accused must be released. 406 U.S. at 738, 92 S.Ct. at 1858.

7. This section provides:

An accredited officer or agent of the Department of Public Health of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a family physician of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application for his admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

Appellant does not challenge his initial commitment to St. Elizabeths pursuant to D.C.Code 1973, § 24–301(a). Rather, he contends his continued commitment after June 28, 1978, when the *Jackson* findings were made, until September 29, 1978, when he was civilly committed under § 21–541, violated equal protection of the law.[8] He contends *Jackson* makes clear that once it is apparent the accused will remain incompetent indefinitely, the purpose of pretrial commitment ceases, mandating immediate release of the accused subject only to subsequent civil commitment under the emergency or non-emergency procedures. He argues that the procedures followed for confinement of an incompetent defendant do not accord the same protections available to a person not charged with crime—*e. g.*, the right to have a court find that because of his mental illness he was "likely to injure himself or others if he is not immediately detained," D.C.Code 1973, § 21–521, the right to a probable cause hearing, *id.*, § 21–525, and the right to present evidence and cross-examine witnesses. *Id.*

We do not read *Jackson* as broadly as appellant. The Court's concern in that case was to prevent indeterminate commitment unless there were commensurate procedural protections. It held that a criminal defendant who is committed solely on account of his incapacity to stand trial cannot be held more than a reasonable period of time necessary to determine whether there is a substantial probability he will attain such capacity in the foreseeable future. "If it is determined that this is not the case," the Court said, "then the State must either *institute* the customary civil commitment proceeding that would be required to commit *indefinitely* any other citizen, or release the defendant." *Jackson v. Indiana, supra,* 406 U.S. at 738, 92 S.Ct. at 1858. (emphasis supplied).

■ Here the period of appellant's confinement after *Jackson* findings were entered was relatively brief and not the permanent confinement, as a practical matter,

faced by the accused in *Jackson. Id.* at 729, 92 S.Ct. at 1853. The Supreme Court in *Jackson* did not require additional temporary measures to justify continued confinement pending disposition of the civil commitment procedures—such as the emergency measures proposed by appellant—and we, too, see no need for such additional measures here. As appellant concedes in his reply brief, fewer safeguards are required when an individual is to be subjected to a limited term of confinement than when he is subjected to an indeterminate term of confinement. Here the trial court without objection directed the government to initiate civil commitment proceedings within 28 days of the *Jackson* findings. This period was later extended 14 additional days. Proceedings were commenced within the additional time, and civil commitment was accomplished within three months of the *Jackson* findings. Supporting this limited detention were the trial court's original finding of incompetence to stand trial due to mental illness, the three subsequent *Jackson* hearings, the *Jackson* findings themselves, the court's knowledge of the facts underlying appellant's criminal charges and its familiarity with appellant's psychiatric reports. More particularly, the trial court was acquainted with a medical report conclusion that appellant would be dangerous to himself or others if released.

■ We conclude that, under the circumstances, appellant was not denied equal protection of the law. We also conclude, however, that in these circumstances, the government should proceed in the future with reasonable dispatch and should not adopt a leisurely attitude. Consequently, for future purposes—and in order to achieve uniformity of procedure in criminal cases—where the court finds after a *Jackson* hearing that the defendant is unlikely to become competent in the foreseeable future, the government should be required to institute a civil commitment proceeding, if

---

8. Appellant makes this contention in the face of express agreement when the court set a

status hearing for July 26, 1978, almost 30 days later.

one is desired, within 30 days of the *Jackson* determination.[9]

*Affirmed.*

---

**9.** While this is not inviolable, an extension should normally be granted only for extraordinary cause shown. *Cf. Bolton v. Harris*, 130 U.S.App.D.C. 1, 10, 395 F.2d 642, 651 (1968) (one found not guilty by reason of insanity must be given a judicial hearing to determine present mental condition; however, commitment without hearing permissible for period required to determine present mental condition).